IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
WICHITA FALLS DIVISION

| | | |
|---|---|---|
| NICHOLE SANCHEZ, et al., | § § § | |
| Plaintiffs, | § § | |
| v. | § § | Civil Action No. 7:15-cv-00012-O |
| YOUNG COUNTY, TEXAS, et al., | § § § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court are Defendants' Motion for Summary Judgment and Brief in Support (ECF Nos. 44–45), filed October 15, 2018; Plaintiffs' Response and Brief in Support (ECF Nos. 49–50), filed November 5, 2018; and Defendants' Reply (ECF No. 53), filed November 11, 2018. Having reviewed the motion, related briefing, and applicable law, the Court finds that Defendants' motion should be and is hereby **GRANTED**.

### I. FACTUAL BACKGROUND

This case arises out of the death of Diana Lynn Simpson ("Mrs. Simpson"), a pretrial detainee in the Young County Jail (the "Jail"). Mrs. Simpson battled depression and attempted suicide a year before her death. *See* Pls.' Br. Supp. Resp. 3, ECF No. 50 [hereinafter, "Pls.' Br. Resp."]. Two weeks before her death, Mrs. Simpson told her husband Edward Leroy Simpson ("Mr. Simpson") that if she "were to try to take her own life again, she would withdraw cash from the ATM, check into a motel using the cash so that he could not track her, and take a lethal dose of pills while at the hotel." *Id*. On May 18, 2013, Mrs. Simpson, a nurse, was working the night shift at Stephens Memorial Hospital in Breckenridge ("Stephens Memorial"). *Id*. She often slept at Stephens Memorial after her shifts because the Simpsons' home was 75 miles away. *Id*. The

1

next day, Mr. Simpson checked his online bank account and noticed a cash withdrawal. *Id*. at 4. Because of Mrs. Simpson's previous threats, Mr. Simpson tried to call her, then called Stephens Memorial to determine whether she was sleeping there. *Id*. Stephens Memorial personnel informed him she left after her shift. *Id*. Mr. Simpson tracked Mrs. Simpson's cell phone location and determined her general location. *Id*. Mr. Simpson again tried to call her and sent text messages. *Id*. He then called local law enforcement agencies to explain his wife was missing and at risk for suicide. *Id*. He called Stephens Memorial again that evening and learned she had not shown up for her next shift. *Id*.

The next morning, Mr. Simpson filed a missing persons report, at the suggestion of Breckenridge law enforcement. *Id*. He also posted a photograph of Mrs. Simpson's vehicle and license plate number on Facebook, requesting that anybody who saw the vehicle contact authorities. *Id*. at 4–5. That evening, Mr. Simpson and the City of Graham Police Department ("Graham Police Department") received a call from a woman who saw a vehicle matching the description. *Id*. Corporal Kyle Ford ("Ford") of the Graham Police Department investigated and found Mrs. Simpson sleeping in her vehicle. *Id*. at 5; *see also* Defs.' Br. Supp. Mot. 4, ECF No. 45 [hereinafter, "Defs.' Mot."]. Ford determined she exhibited signs of possible intoxication, such as being "slow in giving answers, speaking very quietly, [having a] hard time keeping eyes open, etc." Pls.' Br. Resp. 5, ECF No. 50. Ford asked Mrs. Simpson whether she was diabetic or had any medical conditions, and she replied, "no." *Id*.; Defs.' Mot. 4, ECF No. 45. Although Mrs. Simpson first denied taking any medication, the officer observed a pill bottle in her passenger floorboard, and after subsequently searching her vehicle, located a substantial number of partially empty blister packs of medication. *See* Pls.' Br. Resp. 5, ECF No. 50. Mrs. Simpson also admitted to drinking the previous night, and Ford noticed three unopened beer cans in an ice chest in her

front passenger seat, and other opened beer cans discarded in plain view on the back seat. *Id*. Ford asked Mrs. Simpson how much of the medication in her car she had taken, and she replied she had taken all that was missing that morning. *Id*. Ford asked Mrs. Simpson if she was trying to hurt herself, and she replied she was not. *Id*. at 6.

Ford summoned City of Graham paramedics to evaluate Mrs. Simpson, who told Ford that she did not show any signs of suffering from a medical problem, and that her vital signs were normal. *See* Defs.' Mot. 4–5, ECF No. 45. Ford determined he had probable cause to arrest Mrs. Simpson for public intoxication. Pls.' Br. Resp. 6, ECF No. 50; Defs.' Mot. 5, ECF No. 45. Ford asked her if she wanted to be taken to the hospital but she declined. Pls.' Br. Resp. 6, ECF No. 50; Defs.' Mot. 5, ECF No. 45. Ford arrested Mrs. Simpson and transported her to the Jail. *Id*. Officer Gaylon Rich ("Rich") at the Jail conducted Mrs. Simpson's intake medical screening, which did not indicate any behavior or conditions indicative of suicide. Defs.' Mot. 6, ECF No. 45. Mrs. Simpson was "responsive, coherent[], and advised Rich that she didn't want to hurt herself." *Id*. Mrs. Simpson also indicated she was not depressed, was not thinking about killing herself, and had never attempted suicide. *Id*. She was taken to a holding cell after completing the initial medical screening but before finishing the booking process. *Id.* at 7.

After learning Mrs. Simpson was arrested, Mr. Simpson called the Jail multiple times to warn them that she had threatened to take her own life. Pls.' Br. Resp. 9, ECF No. 50. In one call, a jailer told Mr. Simpson that the Jail would not call MHMR (mental health services) until a person was sober. Pls.' Br. Supp. Resp. 9, ECF No. 50. The next morning, Mr. Simpson called the Jail to check on Mrs. Simpson, and he was told she died. *Id*. The subsequent autopsy report notes that at her time of death, Mrs. Simpson had "highly toxic . . . near lethal" levels of various drugs in her system, her cause of death was "mixed drug intoxication," and the manner of death was "consistent

3

with and highly suspicious of suicide." Defs.' Mot. 8, ECF No. 45 (citing Defs.' App. Supp. Mot. Ex. I (Autopsy Report), App. 46–47, ECF No. 46).

Plaintiffs originally brought this action against Defendants in state court for violation of: (1) 42 U.S.C. § 1983, under the Eighth and Fourteenth Amendments of the United States Constitution; and (2) the Texas Tort Claims Act (the "TTCA"). *See generally* Compl., ECF No. 1-3. Defendants removed the action, and the Court granted summary judgment for Defendants on Plaintiffs' episodic act or omission and TTCA claims. *See* Order, ECF No. 20. Plaintiffs appealed, and the Fifth Circuit affirmed that conclusion but remanded the case for consideration of Plaintiffs' unconstitutional conditions of confinement claim. *See* Opinion of USCA, ECF No. 25.

## II. LEGAL STANDARD

### A. Motion for Summary Judgment

The Court may grant summary judgment where the pleadings and evidence show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "[T]he substantive law will identify which facts are material." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine dispute as to any material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The movant must inform the court of the basis of its motion and demonstrate from the record that no genuine dispute as to any material fact exists. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

When reviewing the evidence on a motion for summary judgment, courts must resolve all reasonable doubts and draw all reasonable inferences in the light most favorable to the non-movant. *See Walker v. Sears, Roebuck & Co.*, 853 F.2d 355, 358 (5th Cir. 1988). The court cannot make a credibility determination in light of conflicting evidence or competing inferences.

4

*Anderson*, 477 U.S. at 255. If there appears to be some support for disputed allegations, such that "reasonable minds could differ as to the import of the evidence," the court must deny the motion. *Id.* at 250.

Defendants move for summary judgment on Plaintiffs' only remaining claim—that Mrs. Simpson was subjected to unconstitutional conditions of confinement in violation of 42 U.S.C. § 1983. Defs.' Mot., ECF No. 45.

### B. Section 1983 Unconstitutional Conditions of Confinement

A section 1983 conditions of confinement claim allows pretrial detainees to sue based on the theory that the conditions of their confinement are constitutionally inadequate. *See Duvall v. Dallas Cty.*, 631 F.3d 203, 207 (5th Cir. 2011). To prevail on a conditions of confinement claim, Plaintiffs must plead facts to establish three elements: "(1)'a rule or restriction . . . or the existence of an identifiable intended condition or practice . . . [or] that the jail official's acts or omissions were sufficiently extended or pervasive'; (2) which was not reasonably related to a legitimate governmental objective; and (3) which caused the violation of [a detainee's] constitutional rights." *Montano v. Orange Cty.*, 842 F.3d 865, 874 (5th Cir. 2016). A "pretrial detainee . . . [has] a clearly established [Fourteenth Amendment] . . . right not to be denied, by deliberate indifference, attention to [her] serious medical needs." *Garza v. City of Donna*, 2017 U.S. Dist. LEXIS 206958 at *15 (S.D. Tex. 2017) (quoting *Estate of Pollard v. Hood Cty., Tex.*, 579 Fed. Appx. 260, 265 (5th Cir. 2014)).

Defendants argue that Plaintiffs have not provided evidence of constitutionally inadequate conditions of confinement at the Jail. Defs.' Mot. 13-18, ECF No. 45. Plaintiffs assert that their evidence creates at least a genuine issue of material fact about whether Young County exercised de facto policies sufficient to satisfy the first prong of the conditions of confinement test. Pls.'

5

Resp. 18, ECF No. 50. Defendants reply that Plaintiffs do not plead facts to establish the de facto policy element and, alternatively, Plaintiffs cannot show the alleged de facto policies *caused* a violation of Plaintiffs' constitutional rights. *See* Defs.' Reply, ECF No. 53.

1. Sufficiently Extended or Pervasive Policy

A condition or practice sufficient to satisfy the first element of a conditions of confinement claim can be established by either a formal written policy or a de facto policy. *See Montano*, 842 F.3d at 875. Fifth Circuit precedent holds that "a condition may reflect . . . [a] de facto policy, as evidenced by a pattern of acts or omissions 'sufficiently extended or pervasive, or otherwise typical of extended or pervasive misconduct by [jail] officials, to prove an intended condition or practice.'" *Shepherd v. Dallas Cty.*, 591 F.3d 445, 452 (5th Cir. 2009) (quoting *Hare v. City of Corinth*, 74 F.3d 633, 645 (5th Cir. 1996) (en banc)); *see also Montano*, 842 F.3d at 875. And "evidence showing only 'isolated instances of inadequate medical care' . . . would be insufficient" to show a de facto policy. *Shepherd* 591 F.3d at 455 (quoting *Hare*, 74 F.3d at 644-45). Rather, as mentioned above, "a detainee challenging jail conditions must demonstrate a pervasive pattern of serious deficiencies in providing for his basic human needs; any lesser showing cannot prove punishment in violation of the detainee's due process rights." *Id.* at 454 (emphasis added). Notably, the Court examines the evidence "for policy implementation, not policy outcome." *Montano*, 842 F. 3d at 875.

2. Reasonable Relation to Legitimate Government Interest

If a pattern of acts or omissions is sufficiently pervasive to constitute a de facto policy, the Court must then decide whether the policy is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose. *See Bell v. Wolfish*, 441 U.S. 520, 538 (1979) (citing *Flemming v Nestor*, 363 U.S. 603, 613-617 (1960)). In *Bell*, the Supreme

Court held that "if a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to 'punishment.'" *Id*. at 539. But "if a restriction or condition is not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the governmental action is [unconstitutional] punishment." *Id*.

3. Causation

If a condition of confinement is not reasonably related to a legitimate governmental objective, Plaintiffs must show that the de facto policy caused a violation of the detainee's constitutional rights. This prong derives from the Fourteenth Amendment—specifically, from the guarantee that citizens will not be punished before adjudication of guilt. *See Bell*, 441 U.S. at 535. To establish causation, Plaintiffs must show by a preponderance of the evidence that the condition is "a substantial factor in bringing about the harm and without which the harm would not have occurred." *Montano*, 842 F. 3d at 882.

4. Violation of a Constitutional Right

Some complained of conditions implicate a constitutional right, while others do not. For instance, the Fifth Circuit has held that there is no constitutional "right to psychological screening" for pretrial detainees. *See Burns v. City of Galveston*, 905 F.2d 100, 104 (5th Cir. 1990); *see also Garza v. City of Donna*, 2017 U.S. Dist. LEXIS 206958 at *43 (S.D. Tex. 2017). Further, the Fifth Circuit has held that "the failure to train custodial officials in screening procedures to detect latent suicidal tendencies does not rise to the level of a constitutional violation." *See Evans v. City of Marlin*, 986 F. 2d 104, 108 (5th Cir. 1993); *see also Garza*, 2017 U.S. Dist. LEXIS 206958 at *43.

## III. ANALYSIS

In the Amended Complaint, Plaintiffs assert that Defendants maintained twelve different unconstitutional system-wide jail conditions, customs, or practices that Plaintiffs contend "resulted in an extreme deprivation of the minimal measures of life's necessities." The allegations are as follows:

- Defendants had no actual procedure for assessment or determination of the suicide risk of pretrial detainees, despite the existence of an assessment form, as the de facto policy was not to complete the forms.

- Defendants systematically ignored the written policies for observation of suicidal pretrial detainees.

- Defendants, while having a written policy that pretrial detainees deemed a suicide risk be placed in cells that would allow for maximum visual observation at all times, systematically disregarded this policy.

- Defendants systemic failure to complete the required intake screening form resulted in the misclassification and misplacement of highly-intoxicated pretrial detainees in cells that lacked maximum visual observation by Jail staff.

- Defendants had no enforced policy for the proper monitoring of highly-intoxicated pretrial detainees.

- Defendants had a longstanding policy, custom, and practice of detaining highly-intoxicated detainees without constitutionally adequate visual surveillance or audio monitoring, which did not allow for a maximum visual observation at all times by Jail staff.

- Defendants' policy and custom was to house highly-intoxicated pretrial detainees in cells that lacked adequate audio and visual surveillance, while only completing "cell checks" once every twenty-five minutes. Instead of actually entering the cells to closely monitor the detainees' health and safety, the jail staff was allowed to use a wand system whereby they could record a "cell check" without ever actually entering the cell.

- Defendants had no enforced policy to comply with the Texas Commission on Jail Standards ("TCJS") requirements related to the Continuity of Care Query ("CCQ") system, including its required training, use, and required follow-up—resulting in a failure to train.

- Defendants, by policy, allowed untrained personnel without proper jailer certificates and training to monitor inmates with documented mental and medical issues.

- Defendants did not adequately train staff on how to properly recognize inmates at risk for overdose, suicide, or how to monitor and keep safe inmates from overdose or suicide in violation of 37 TEX. ADMIN. CODE, part 9, Section 273.5(a)(1).

- Defendants had no alcohol or detox policy for persons with documented coherency issues, documented drug ingestion, and documented suicide tendencies, such as Mrs. Simpson.

- Despite a written policy, Defendants failed to have an established procedure for visual, face-to-face observation of all inmates by jailers, in violation of 37 TEX. ADMIN. CODE, part 9, Section 273.5(a)(5).

*See* Am. Compl., ECF No. 34.

### A. De Facto Policies

In their motion for summary judgment, Defendants argue that they never adopted—implicitly or otherwise—the de facto policies alleged by Plaintiffs, and that Plaintiffs cannot provide evidence sufficient to create a genuine issue of material fact about whether any of the alleged conditions of confinement were unconstitutional. *See* Defs.' Mot., ECF No. 45. Plaintiffs respond that fact issues exist as to whether Defendant maintained unconstitutional conditions of confinement that caused Mrs. Simpson's death[1] and point to a declaration by a medical doctor who states that "if given appropriate medical care prior to her deterioration into cardiac arrest she would have survived this mixed-drug intoxication." Pls.' Br. Resp. 39–50, ECF No. 50; Pls.' App. Supp. Resp. (Declaration of Robert Bassett), App. 352, ECF No. 51. Each assertion in the amended complaint appears to fit into one of three categories of de facto policies Plaintiffs allege were in place at the Jail—failure to properly train officers, failure to properly observe intoxicated pre-trial detainees, or failure to properly complete forms and identify suicidal tendencies at intake. The Court will examine each of the three categories of alleged de facto policies in turn. For the reasons set forth below, the Court finds that Plaintiffs cannot satisfy the elements of their claim as a matter of law.

#### 1. Failure to Train Policy

In the Amended Complaint, Plaintiffs argue that Defendants maintained a de facto policy of failing to train its jailers by (1) not training employees to comply with TCJS requirements related

---

[1] In the Response, Plaintiffs allege a number of contested issues of fact. *See* Pls.' Br. Resp. 39, ECF No. 50. But "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of material fact" and "the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–248 (1986). Accordingly, the Court will examine those factual disputes—if any—which are *material* to Plaintiff's conditions of confinement claim.

to the CCQ system; (2) allowing untrained personnel without proper certification[2] and training to monitor inmates with documented mental and medical issues; (3) failing to adequately train staff on how to properly recognize inmates at risk for overdose and suicide—or to monitor and keep safe inmates from overdose or suicide; and (4) failing to train employees on alcohol or detox policies for persons with documented coherency issues, documented drug ingestion, and documented suicidal tendencies. *See* Am. Compl., ECF No. 34. Defendants argue Plaintiffs cannot create a genuine issue of material fact as to the existence of a de facto policy of failing to adequately train employees to handle suicidal or intoxicated detainees because Sheriff Walls adequately trained his staff on those issues and any instance of failing to train was not pervasive. Defs.' Mot. 18, ECF No. 45. Plaintiffs respond that Defendants' de facto policy allowed jailers to place detainees in holding cells without reviewing their CCQ and that jailers were not adequately trained to make medical or mental health care assessments.[3] Pls' Br. Resp. 23–27, ECF No. 50. Defendants reply that Young County jailers were trained on intake procedures, that Plaintiffs present a generalized claim and have not shown how inadequate training was pervasive, or even affected any other similarly situated detainees. Defs.' Reply 14–15, ECF No. 53.

In *Duvall*, the Fifth Circuit examined whether a jail adopted a pervasive unconstitutional custom or policy of implicitly allowing a MRSA infection to run rampant in the facility. *See Duvall*, 631 F.3d at 203. It noted that the evidence "was amply sufficient to prove that the

---

[2] Plaintiffs do not explain their "proper certification" argument in the complaint and do not address the issue at all in the Response. Instead, Plaintiffs focus on their "failure to train" argument. Additionally, the evidence provided in Plaintiffs' Appendix does not indicate jailers lacked required certifications. *See, e.g.*, Pls.' App. Supp. Resp. (Annual Jail Report), App. 282, ECF No. 51 ("reviewed all 19 officer TCLEOSE certification records").

[3] The Court examines this claim under a conditions of confinement theory but notes that the Fifth Circuit generally characterizes failure to train claims as episodic acts or omissions claims. *See Johnson v. Johnson Cty.*, 2006 WL 1722570, at *4 n.4 (N.D. Tex. 2006) (Fitzwater, J.) ("[Plaintiff], too, includes a training-based claim. This claim is treated as an 'episodic act or omission' claim under circuit precedent.") (internal citations omitted) (collecting cases).

11

violations were serious, extensive and extended, and that they were much more than de minimis." *Id.* at 208. In that case, the evidence showed that the jail's incidence of MRSA was twenty times higher than comparable jails, and that the county was aware of the situation for at least three years. *Id*. While factually distinct, the legal standard espoused in *Duvall* applies to the case at hand— *failing* to act can be evidence of a de facto policy if sufficiently pervasive.

Here, Plaintiffs assert that Defendants had a pervasive and unconstitutional policy of failing to train employees. But Plaintiffs fail to identify evidence showing that the failure to train on these subjects was pervasive.[4] In fact, evidence provided by Plaintiffs shows the opposite—that Young County policies mandated training, that it did provide training on intake procedures, that jailers were required to complete relevant training courses, that intoxicated inmates were examined on a case-by case basis, and that jailers were trained to complete suicide-risk screenings upon intake.[5] Plaintiffs allege factually specific violations of official policies and label those *violations* a de facto policy—when in fact they simply point out episodic acts or omissions. *Cf. Estate of Henson v. Wichita County, Tex.*, 795 F.3d 456, 466 (5th Cir. 2015) ("Plaintiff's evidence of a de facto 'policy'…[came] mostly from [one] previous case," and that evidence was not sufficient to show an unconstitutional policy). While it is unfortunate that County employees violated various policies, the evidence does not show these individual violations derive from a pervasive failure to train. Accordingly, the Court finds that Defendants did not exercise a de facto policy of failing to train employees and that Defendants' motion for summary judgment on the failure to train claims

---

[4] Plaintiffs point to a declaration including a jail expert's opinion on the Jail's policies and rely primarily on a generalized policy argument that jailers received inadequate medical training—rather than explaining how Defendants pervasively failed to train jailers on the specific issues identified in the amended complaint. *See* Pls.' Br. Resp., ECF No. 50.

[5] *See* Pls.' App. Supp. Resp. (Deposition of Gaylon Rich), App. 131–132, ECF No. 51; *Id*. at App. 164; *Id*. (Deposition of Bobby Joe Cook), at App. 185; *Id*. at App. 179; *Id*. (Deposition of Michael Burt) at App. 193–194.

12

should be and is hereby **GRANTED**.[6]

### 2. Failure to Observe Detainees Policy

In the Amended Complaint, Plaintiffs argue that Defendants maintained a de facto policy of failing to observe inmates by (1) systematically ignoring the written policies for observation of pretrial detainees posing a suicide risk; (2) not placing pretrial detainees deemed a suicide risk in the cells that would allow for maximum visual observation of the safety and welfare of those detainees at all times—despite maintaining a written policy to do so; (3) failing to enforce a policy for the proper monitoring of highly-intoxicated pretrial detainees; (4) detaining highly-intoxicated detainees without constitutionally adequate visual surveillance or audio monitoring; (5) using an electronic wand system to complete cell checks instead of actually entering cells to monitor the detainees' health and safety; and (6) failing to establish a procedure for visual, face-to-face observation of all inmates by jailers. *See* Am. Compl., ECF No. 34. Defendants argue Plaintiffs cannot provide evidence of a de facto policy of failing to create or enforce a policy for observing suicidal or intoxicated detainees. Defs.' Mot. 17, ECF No. 45. Defendants state the evidence shows the County followed their health services plan—detainee cells are physically checked each half-hour and cells are viewable by camera at all times. *Id*.

Plaintiffs respond that individual TCJS violation citations provide evidence that Young County has a de facto policy of not regularly conducting cell checks. Pls.' Br. Resp. 34, ECF No. 50. Plaintiffs note physical checks are particularly important at the Jail because the windows on female detainee cells were kept closed to prevent male detainees from seeing female detainees. *Id*.

---

[6] Because the Court finds there is no pervasive pattern of failing to train, it does not reach the causation element which is necessary to prove an unconstitutional condition of confinement. *But see Grandstaff v. City of Borger*, 767 F.2d 161, 169 (5th Cir. 1985) ("An 'inadequate' training program alone is not ordinarily the moving force between an injured plaintiff's harm. Because the police officer [or jailer] who injures the plaintiff does not rely upon inadequate training as tacit approval of his conduct. It is not enough that the city could, but does not, reduce the risk of harm to the plaintiff.")

13

at 33. Defendants reply that Plaintiffs do not provide evidence that observation was pervasively deficient in these types of instances, that the inspection reports relied on by Plaintiffs are both random and inconclusive, that video cameras are only one means used to observe the cells, and that Plaintiffs rely on inconsistencies with certain documentary reports generated by an electronic wand accountability system—rather than evidence that officers *pervasively* failed to personally observe inmates. Defs.' Reply 12–14, ECF No. 53.

The Fifth Circuit remanded this case and directed the Court to consider "whether there is any genuine issue of material fact that Mrs. Simpson was subjected to the County's unconstitutional conditions of confinement." *Sanchez v. Young Cty.*, 866 F.3d 274, 279 (5th Cir. 2017). A "'condition of confinement' case is a 'constitutional attack on general conditions, practices, rules, or restrictions of pretrial confinement." *Scott v. Moore*, 114 F.3d 51, 53 (5th Cir. 1997). And *Shepherd* clarified that "more often, however, a plaintiff's claim, properly characterized, faults specific jail officials for their acts or omissions because the plaintiff cannot establish the existence of an officially sanction unlawful condition." *Shepherd*, 591 F.3d at 452. "In these cases, 'an actor usually is interposed between the detainee and the municipality, such that the detainee complains first of a particular act of, or omissions by, the actor and then points derivatively to a policy, custom, or rule (or lack thereof) of the municipality that permitted or caused the act or omission.'" *Id.* at 452 (citing *Scott*, 114 F.3d at 53).

Having reviewed the record and considered Plaintiffs' arguments, the Court finds that Plaintiffs do not raise a genuine issue of material fact that Defendants employed an unofficial custom or practice—much less *pervasive* acts—of failing to monitor detainees.[7] Plaintiffs do not

---

[7] The evidence plainly contradicts Plaintiffs' characterizations in a number of ways. First, jailers conducting cell checks *were* expected to look through cell windows during those checks. *See* Pls.' App. Supp. Resp. (Deposition of Gaylon Rich), App. 154, ECF No. 51; *Id.* at App. 157.; *Id.* (Deposition of Bobby Joe Cook), at App. 176–177. Second, Defendants had a policy of conducting routine cell checks, and also

provide evidence of other detainees that jailers failed to observe—which would be the first step to show such a practice is pervasive. Rather, Plaintiffs assert specific factual claims about the night Mrs. Simpson passed away and subsequent TCJS citations. Each of those claims involve a failure or failures by an interposed actor—rather than evidence of either an official or de facto policy—and are more accurately characterized as episodic act or omissions arguments. Accordingly, the Court finds Defendants' motion for summary judgment on the failure to observe claims should be and is hereby **GRANTED**.

> 3. Failure to Complete Forms and Identify Suicidal Tendencies Upon Intake Policy

In the Amended Complaint, Plaintiffs argue that Defendants maintained a de facto policy of failing to properly complete intake procedures and identify suicide risks by (1) not ensuring intake assessment forms were properly used or filled out; and (2) misclassifying and misplacing highly intoxicated pretrial detainees in cells that lacked maximum visual observation at all times. *See* Am. Compl., ECF No. 34. Defendants argue Plaintiffs cannot provide sufficient evidence to show a pervasive pattern of failing to adhere to written suicide policies. Defs.' Mot. 13-14, ECF No. 45. Plaintiffs respond that (1) testimony from jail officials establishes that Young County had a routine custom of placing intoxicated detainees in a detox holding cell to let them "sleep it off"

---

used video cameras. *Id*. Third, Defendants had a special policy for observing detainees identified as suicide risks. *Id*. (Deposition of Michael Burt), at App. 204. Fourth, the fact that the County employed a wand system to document cell checks is not proof that they did not complete proper cell checks. And discrepancies between wand system data and actual visual surveillance merely highlight jailer-specific acts or omissions—not a de facto policy. Finally, Plaintiffs failed to provide evidence that Defendants *pervasively* failed to provide face-to-face observation of inmates. Plaintiffs also failed to provide evidence of any other detainees who were subject to allegedly insufficient observation to aid their contention that this was a pervasive problem. *See Estate of Henson*, 795 F.3d at 466 (The evidence "falls short of proving conduct so *pervasive* and *typical* as to constitute an intended condition or practice.") (emphasis added); *Cf. Montano*, 842 F.3d at 876 ("the evidence was sufficient for a reasonable juror to infer a de facto policy that *every* seemingly detoxifying detainee was left in the bubble without emergency medical care" and "[g]iven the *striking uniformity* of the jail employees' testimony, further evidence was not required for a reasonable juror to infer a de facto policy for conditions or practices.") (emphasis added).

before completing relevant intake forms or identifying possible suicide risks; and (2) jailers only consider the self-reporting questions in the suicide-screening form—not outside information. Pls.' Br. Resp. 22, 29, ECF No. 50. Defendants reply that Plaintiffs produce no evidence of any other intoxicated detainees being automatically placed into a holding cell before completing the book in process, that testimony confirms detainees are assessed on a case-by-case basis, and that jailers may properly rely on a detainee's responses to the suicide-screening questionnaire upon initial intake. Defs.' Reply 4–7, ECF No. 53.

In *Shepherd*, the Fifth Circuit noted that "isolated examples of illness, injury, or even death, standing alone, cannot prove that conditions of confinement are constitutionally inadequate." *Shepherd*, 591 F.3d at 454. In *Montano*—while affirming a jury's verdict—the Circuit clarified that when there is "striking uniformity" in jail employees' testimony "further evidence [is] not required for a reasonable juror to infer a de facto policy for conditions or practices." *Montano*, 842 F.3d at 876. The Circuit stated that "[j]urors heard consistent testimony that a given protocol was followed for *every similarly-situated detainee*." *Id*. (emphasis added). Here, however, Plaintiffs have not provided *any uniform* evidence of intoxicated detainees being automatically placed in holding cells before completing book-in to permit a conclusion that this alleged practice was pervasive.[8] Not only do the jailers' testimony undercut Plaintiffs' claims, but the generalized

---

[8] Plaintiffs point to portions of testimony about general intake procedures where one jailer said CCQ's should be reviewed at book-in if received in time, two jailers said that intoxicated detainees were put in a holding cell *after* initial book-in, and one jailer said that officer observations could be completed after initial book-in. Pls.' App. Supp. Resp. (Deposition of Gaylon Rich), App. 150, ECF No. 51; *Id*. at 167; *Id*. (Deposition of Bobby Joe Cook), at App. 179–180. But the testifying jailers also stated that inmates were evaluated on a case-by-case basis, and even testified that violent inmates are placed in a different cell than the one Diana Simpson was placed in. *See* Pls.' App. Supp. Resp. (Deposition of Bobby Joe Cook), App. 179, ECF No. 51; *Id*. (deposition of Michael Burt), at App. 192; *Id*. (Deposition of Bobby Joe Cook), at App. 177. They further testified that a suicide screening is completed before a detainee is placed in a holding cell, and that a decision to contact MHMR at intake is case-by-case but that *MHMR* refuses to come to the Jail to see intoxicated detainees. *Id*. (Deposition of Bobby Joe Cook), at App. 179. The jailers also testified that medical forms were generally completed later during the book-in process than the suicide screening—after a detainee had time to regain sobriety. *Id*. (Deposition of Michael Burt), at App. 194.

16

testimony of the three jailers Plaintiffs rely on hardly provides striking uniformity about jail protocol for every similarly-situated intoxicated detainee.

The testimony of the jailers was strikingly consistent, however, on one issue—jailers may have pervasively failed to timely complete suicide screenings and medical intake forms when intoxicated detainees first arrived at the Jail. The Court finds that Plaintiffs have raised a genuine issue of material fact as to whether Defendants had a de facto policy of failing to complete intake forms before placing intoxicated pre-trial detainees in holding cells. Accordingly, the Court will consider whether failing to complete these forms was *causally* linked to unconstitutional denial of adequate medical care.

### B. Constitutional Violation and Causation

As stated above, to prevail on a conditions of confinement claim, Plaintiffs must show it *caused the violation* of [a detainee's] constitutional rights." *Montano*, 842 F.3d at 874 (emphasis added). Plaintiffs allege each deficient condition of confinement violated Mrs. Simpson's constitutional rights—denial of medical care.[9] *See* Pls.' Br. Resp., ECF No. 50. Defendants argue that Plaintiffs cannot provide evidence creating a genuine issue of material fact as to whether any alleged unconstitutional condition of confinement *caused* Mrs. Simpson to be deprived of constitutionally required medical care. Defs.' Mot. 19, ECF No. 45. Plaintiffs respond that the evidence establishes Mrs. Simpson required serious care from the Jail upon intake and throughout her custody because she could not act on her own after being detained. Defendants reply that Plaintiffs only provide evidence of causal links between the acts or omissions of individual jailers

---

[9] Plaintiffs also generally respond that Defendants had a de facto policy of denying medical care to intoxicated detainees but do not point to evidence of intoxicated detainees, apart from Mrs. Simpson, being denied medical care. Further, jailers testified that the Jail does not accept intoxicated detainees when they struggle to walk and blood alcohol content is tested at a certain level—unless they are first taken to a hospital for care. Pls.' App. Supp. Resp. (Deposition of Gaylon Rich), App. 140, ECF No. 51; *Id.* (Deposition of Bobby Joe Cook), at App. 175.

17

and any denial of medical care—not between the alleged de facto policies and denial of medical care. Defs.' Reply 16–25, ECF No. 53.

The Fifth Circuit's prior opinion provided that "regardless whether there was a fact issue that failure of jailers to 'complete' Mrs. Simpson's intake screening questionnaire and to request a CCQ reflected County 'policies or customs,' these are matters of file documentation. There is no proof that any such alleged deficiencies in jail procedures were causally linked to Mrs. Simpson's death under the circumstances of this case." *Sanchez*, 866 F.3d at 280. The evidence does not raise a fact issue indicating that failure to complete the intake-screening form itself denied Mrs. Simpson medical care. Nothing about failing to complete that form—when examining the facts of this case—was causally linked to Defendants failure to provide Mrs. Simpson requisite medical care.[10] Not to mention, Mrs. Simpson's "intake questionnaire was substantially completed, in any event." *Id*. As tragic as the facts may be, there is no evidence that completing the bottom-quarter of the screening form alone—the section reserved for a jailer's medical observations—would have changed the facts that Mrs. Simpson ingested alcohol and pills, denied multiple offers of medical care, told jailers she was not suicidal, and appeared to those jailers to be merely intoxicated. For the reasons stated above, the Court finds that Defendants' motion for summary judgment on the failure to complete forms claim should be and is hereby **GRANTED**.

---

[10] Plaintiffs' jail expert provides that "not completing the required medical/mental health and suicide screening risk form resulted in critical information about Mrs. Simpson's condition to be lost." Pls.' App. Supp. Resp. (Report of Jail Operations Expert Jeff Eiser) App. 300, ECF No. 51. Plaintiffs' medical expert provides that "if given appropriate medical care prior to her deterioration into cardiac arrest she would have survived this mixed-drug intoxication." *Id*. (Medical Expert Record Review of Robert Bassett), at App. 352. But neither Plaintiffs nor the experts address how any of the "critical information" left off the form was causally linked to a violation of Mrs. Simpson's constitutional rights—for example, how completing that portion of the form would have led to medical care, or how including any missing information could have prevented harm to Mrs. Simpson. Essentially, both Plaintiffs and the experts fail to explain how not completing the bottom portion of the form itself was "a substantial factor in bringing about the harm and *without which the harm would not have occurred*." *Montano*, 842 F. 3d at 882 (emphasis added).

## IV. CONCLUSION

The Fifth Circuit has somberly noted, "[t]he Constitution does not require that officers always take arrestees suspected to be under the influence of drugs or alcohol, or reported by relatives to be at risk, to a hospital against their wishes." *Id*. at 281. That is what has occurred here. Accordingly, based on the foregoing Defendants' Motion for Summary Judgment (ECF No. 44) is **GRANTED**.[11] A Final Judgment will issue separately.

**SO ORDERED** on this **22nd day** of **January, 2019**.

_____
Reed O'Connor
**UNITED STATES DISTRICT JUDGE**

---

[11] The Court disposed of all claims and, accordingly, does not reach a discussion of wrongful death or survivorship damages. *But see Montano*, 842 F.3d at 882 (wherein the Fifth Circuit clarified that a causal link is required between an unconstitutional condition of confinement and the detainee's death to recover wrongful death damages. Notably, a causal link can exist in a wrongful death case if a county unconstitutionally denies medical care as a result of a de facto policy—but only if that denial of care *causes* detainee's death).